AO 93C  (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means     ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br><br>The person of JACOB DANIEL LEWIS ("Lewis"),<br>date of birth of 10/26/1983, with last known address<br>of 12606 Autumn Leaves Avenue, Victorville,<br>California. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 5:21-MJ-00027 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Central District of California *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

*See Attachment B*

Such affidavit(s) or testimony are incorporated herein by reference and attached hereto.

**YOU ARE COMMANDED** to execute this warrant on or before <u>14 days from the date of its issuance</u> *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>the U.S. Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for ____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: _____

City and state: <u>Riverside, CA</u>

_____
*Judge's signature*

Hon. Sheri Pym, U.S. Magistrate Judge
*Printed name and title*

AUSA: Dennise Willett (213-500-9811)

AO 93C  (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means (Page 2)

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**AFFIDAVIT**

I, Scott H. Winrow, being duly sworn, declare and state as follows:

**I. INTRODUCTION**

1.    I am a Special Agent for the Federal Bureau of Investigation ("FBI") and have been so employed since July 2004. I am currently assigned to the Los Angeles Division, Riverside Resident Agency, in Riverside, California, where my duties primarily include counterterrorism investigations.  As an FBI Special Agent, I have received approximately 17 weeks of training at the FBI Academy in Quantico, Virginia.  During my employment with the FBI, I have participated in investigations, both as case agent and in a supporting role, involving fraud, counterfeiting, and national security matters, including into crimes committed by self-identified sovereign citizens, among other things.  During these investigations, I have used a variety of investigative techniques and resources, including physical and electronic surveillance, subpoenas, the receipt and analysis of telephone records, and the use of various types of informants and cooperating sources.  Through these investigations, my training and experience, and communication

1

with other law enforcement investigators, I am also familiar
with investigations concerning wire fraud, mail fraud, bank
fraud, and bankruptcy fraud, including the use of the following
in the commission of these offenses--receipts, notes, ledgers,
tally sheets, invoices, tax documents, bank records, and other
physical and electronic records.  I am further familiar with how
these items and documents are maintained in personal and
business holdings, as well as computers, electronic devices,
thumb drives, external hard drives, and other data storage
devices used to maintain records.  As a federal agent, I am
authorized to investigate violations of laws of the United
States, and as a law enforcement officer I am authorized to
execute warrants issued under the authority of the United
States.

## II. <u>PURPOSE OF AFFIDAVIT</u>

2.   This affidavit is made in support of a warrant to
search the person of Jacob Daniel Lewis ("LEWIS"), as described
more fully in Attachment A, for evidence, fruits and
instrumentalities of violations of the following statutes, as
described more fully in Attachment B, which is also incorporated
herein by reference: 18 U.S.C. § 1512(c)(2) (Obstruction of
Congress); 18 U.S.C. § 111 (Assault of a Federal Officer); 18
U.S.C. § 231 (Civil Disorders); 18 U.S.C. § 371 (Conspiracy); 18

U.S.C. § 372 (Conspiracy to Impede or Injure Federal Officers);
18 U.S.C. § 930 (Possession of Firearms and Dangerous Weapons in
Federal Facilities); 18 U.S.C. § 641 (Theft of Government
Property); 18 U.S.C. § 1361 (Destruction of Government
Property); 18 U.S.C. § 2101 (Interstate Travel to Participate in
a Riot); 18 U.S.C. § 1752(a)(1) and (2) (Unlawful Entry on
Restricted Buildings or Grounds); and Title 40 U.S.C. Section
5104(e)(2) (Violent Entry, Disorderly Conduct, and other
offenses on Capitol Grounds) (the "Target Offenses") that have
been committed by LEWIS and other identified and unidentified
persons, as described in the search warrant affidavit.

     3.   The facts set forth in this affidavit come from my
personal observations, my training and experience, and
information obtained from other agents, witnesses, and agencies.
This affidavit is intended to show merely that there is
sufficient probable cause for the requested warrant.  It does
not set forth all of my knowledge, or the knowledge of others,
about this matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only and all dates and times
are approximate.

### III. SUMMARY OF PROBABLE CAUSE

     4.   LEWIS is a Victorville resident who traveled to
Washington D.C. to participate in a protest that became a

3

violent riot at the United States Capitol on January 6, 2021,
while a joint session of Congress met to certify the results of
the 2020 Presidential Election.  During the riot, LEWIS
unlawfully entered and remained in the United States Capitol.
According to the complaint affidavit filed against LEWIS in the
District of Columbia, he breached the Senate Wing Door to the
Capitol Building at approximately 2:56:06pm on January 6, 2021
and walked through various portions of the Capitol. He also took
photos and or videos while inside the Capitol and on other
portions of Capitol Grounds.

5.   On January 22, 2021, the Honorable Zia M. Faruqui,
United States Magistrate Judge in the District of Columbia,
issued a criminal complaint and arrest warrant charging Lewis
with violations of 18 U.S.C. § 1752(a)(1) and (2) (Unlawful
Entry on Restricted Buildings or Grounds) and Title 40 U.S.C.
Section 5104(e)(2) (Violent Entry, Disorderly Conduct, and other
offenses on Capitol Grounds).  The criminal complaint, arrest
warrant, and affidavit in support thereof are attached hereto as
Exhibit A and incorporated herein by reference.  As detailed
further below, there is probable cause to believe that
additional evidence of these and other offenses detailed above –

4

including digital device(s) used by LEWIS during the riot at the U.S. Capitol – will be found on the person of LEWIS.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.   Background – The U.S. Capitol on January 6, 2021

6.   The United States Capitol Police ("USCP"), the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

7.   At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres.  The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point.  The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol.  On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor.  On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center

surrounded by a concrete parkway.  All of this area was
barricaded and off limits to the public on January 6, 2021.

8.    The U.S. Capitol is secured 24 hours a day by USCP.
Restrictions around the U.S. Capitol include permanent and
temporary security barriers and posts manned by USCP.  Only
authorized people with appropriate identification are allowed
access inside the U.S. Capitol.

9.    On January 6, 2021, a joint session of the United
States Congress was scheduled to convene at the U.S. Capitol to
certify the vote count of the Electoral College of the 2020
Presidential Election, which took place on November 3, 2020
("Certification"). The exterior plaza of the U.S. Capitol was
closed to members of the public.

10.   A crowd began to assemble near the Capitol around
12:30 p.m. Eastern Standard Time (EST), and at about 12:50 p.m.,
known and unknown individuals broke through the police lines,
toppled the outside barricades protecting the U.S. Capitol, and
pushed past USCP and supporting law enforcement officers there
to protect the U.S. Capitol.

11.    The joint session began at approximately 1:00 p.m.
in the House Chamber.

12.  At approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber. Also around this time, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building, in part because of a suspicious package found nearby.  Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

13.  As the proceedings continued in both the House and the Senate, USCP attempted to keep the crowd away from the Capitol building and the proceedings underway inside.  Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence."  I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

14.  At approximately 2:00 p.m., some people in the crowd forced their way through, up, and over additional barricades and law enforcement.  The crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or

remain in the building and, prior to entering the building, no
members of the crowd submitted to security screenings or weapons
checks by USCP officers or other authorized security officials.
At such time, the certification proceedings were still underway
and the exterior doors and windows of the U.S. Capitol were
locked or otherwise secured.  Members of law enforcement
attempted to maintain order and keep the crowd from entering the
Capitol.

15.  At about 2:10 p.m., individuals in the crowd forced
entry into the U.S. Capitol, including by breaking windows and
by assaulting members of law enforcement, as others in the crowd
encouraged and assisted those acts.  Publicly available video
footage shows an unknown individual saying to a crowd outside
the Capitol building, "We're gonna fucking take this".



16.   Shortly thereafter, at approximately 2:20 p.m. members
of the United States House of Representatives and United States
Senate, including the President of the Senate, Vice President
Mike Pence, were instructed to—and did—evacuate the chambers.
That is, at or about this time, USCP ordered all nearby staff,
Senators, and reporters into the Senate chamber and locked it
down.  USCP ordered a similar lockdown in the House chamber.  As
rioters attempted to break into the House chamber, by breaking
the windows on the chamber door, law enforcement were forced to
draw their weapons to protect the victims sheltering inside.

17.   At approximately 2:30 p.m., known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building.  Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers. Many of the federal police officers were injured, several were admitted to the hospital, and at least one federal police officer died as a result of the injuries he sustained.  The subjects also confronted and terrorized members of Congress, Congressional staff, and the media.  The subjects carried weapons including tire irons, sledgehammers, bear spray, and tasers.  They also took police equipment from overrun police including shields and police batons.  At least one of the subjects carried a handgun with an extended magazine.  These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

18.   Also at approximately 2:30 p.m., as subjects reached the rear door of the House Chamber, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

10

19.   At around 2:45 p.m., subjects broke into the office of House Speaker Nancy Pelosi. At about the same time, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

20.   At around 2:47 p.m., subjects broke into the United States Senate Chamber.  Publicly available video shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber.  Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.



21.   After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where

the fuck is Nancy?"  Based upon other comments and the context,
law enforcement believes that the "Nancy" being referenced was
the Speaker of the House of Representatives, Nancy Pelosi.



22.  A subject left a note on the podium on the floor of
the Senate Chamber.  This note, captured by the filming
reporter, stated "It's Only A Matter of Time Justice is Coming."



23.   During the time when the subjects were inside the
Capitol building, multiple subjects were observed inside the
U.S. Capitol wearing what appears to be, based upon my training
and experience, tactical vests and carrying flex cuffs.  Based
upon my knowledge, training, and experience, I know that flex
cuffs are used as plastic restraints for a person's wrists,
similar in use to metal handcuffs.

13





14

24.   At around 2:48 p.m., DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m.

25.   At about 3:25 p.m., law enforcement officers cleared the Senate floor.

26.   Between 3:25 and around 6:30 p.m., law enforcement was able to clear the U.S. Capitol of all of the subjects.

27.   Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day.   In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured.   The proceedings resumed at approximately 8:00 pm after the building had been secured.   Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

28.   Beginning around 8:00 p.m., the Senate resumed work on the Certification.

15

29.  Beginning around 9:00 p.m., the House resumed work on the Certification.

30.  Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3:00 a.m. on January 7, 2021.

31.  During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

32.  Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021.  Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

33.  Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity.  It

appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property.  As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

34.  Photos below, available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot.  In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos:

17



<hr>

[1]https://losangeles.cbslocal.com/2021/01/06/congresswoman-
capitol-building-takeover-an-attempted-coup/





---

[2]https://www.businessinsider.com/republicans-objecting-to-electoral-votes-in-congress-live-updates-2021-1.

[3]https://www.thv11.com/article/news/arkansas-man-storms-capitol-pelosi/91-41abde60-a390-4a9e-b5f3-d80b0b96141e

## B.   LEWIS' Crimes at the U.S. Capitol

35.   On January 8, 2021, the Federal Bureau of
Investigation, Riverside Residential Agency ("RVRA") received a
tip relayed from the National Threat Operations Center advising
that LEWIS "flew from Victorville, CA to Washington, D.C. to
attack the Capitol along with many Trump supporters to stop the
certification of the electoral college."  The tip stated LEWIS
posted videos from the US Capitol on January 6, 2021 on his
personal Instagram account: @jdl_333.  The tip also stated that
LEWIS was the owner of The Gym, a fitness business in
Victorville, California.

36.   On January 11, 2021, RVRA received a telephone tip
from another individual, who stated s/he was a friend of LEWIS.
This person stated that during a conversation in December 2020,
LEWIS told them to "watch what happens to the Capitol on the
6th."  This person said that LEWIS had shown them pictures of
firearms and previously asked them if they could get LEWIS
ammunition, but this person had never seen LEWIS with any guns
in person, and did not hear LEWIS make any threats of violence
regarding January 6, 2021.  This person observed photos or
videos of the US Capitol from January 6, 2021 on LEWIS'
Instagram account, which they also identified as @jdl_333.

20

37.  On January 15, 2021, LEWIS agreed to take part in an interview with me at his residence in Victorville, California regarding his involvement in the aforementioned events of January 6, 2021.  LEWIS stated that he traveled from California to Washington D.C. from January 4-7, 2021 to attend President Trump's rally on January 6, 2021.  He stated that he attended the rally on January 6, 2021 dressed in a black jacket, red beanie hat, and blue jeans.

38.  LEWIS admitted that following the rally, he walked toward the Capitol, and that he then entered the capitol building with a number of people after it had been breached by others.  He stated that he was never told that he could not enter, and that he was "escorted" by the police in the building. He stated that he did not partake in any violence while he was in the building and that he believed that some individuals involved in agitating were Antifa members in disguise.

39.  LEWIS acknowledged that his Instagram account is @jdl_333 and that he had posted videos of the capitol grounds on January 6, 2021.  He provided me with temporary access to view his account.

40.  I reviewed the video posted by LEWIS on Instagram on or about January 6, 2021.  The video depicts a large crowd

gathered on the steps and terrace of the US Capitol.  I and
other FBI agents also reviewed multiple other videos depicting
the Capitol building and grounds on January 6, 2021.

    41.  Among these videos was one that had been posted online
by another individual, and subsequently submitted to the FBI via
an online tip.  Based on the nature of the video, knowledge of
LEWIS, a comparison to known photographs of LEWIS, clothing
consistent with the clothing that LEWIS acknowledged wearing on
that day, and other evidence discussed herein, I believe that
this video depicts LEWIS walking up the US Capitol steps.  A
still from that video is included below:



    42.  Among these videos, FBI agents also observed United
States Capitol Police video from various locations in the
Capitol Building.  FBI SA Stephen Hart, affiant for LEWIS'

complaint and arrest warrant, has reviewed the videos and based on that review, the nature of the videos, his knowledge of LEWIS, a comparison to known photographs of LEWIS, clothing consistent with the clothing that LEWIS acknowledged wearing on that day, and other evidence discussed herein, SA Hart believes that LEWIS is depicted in a United States Capitol Police video breaching the Senate Wing Door to the Capitol Building at approximately 2:56:06pm on January 6, 2021. SA Hart informed me that additional US Capitol Police videos then show LEWIS walking by the House Wing doors, through the Hall of Columns, through the Crypt and then exiting out of the South Door at approximately 3:03pm, and at no point does it appear that he has a police escort. A still from the video of LEWIS breaching the Senate Wing Door and a still from the video of LEWIS walking through the Hall of Columns wearing the same clothing is included below. These stills look like the person I interviewed and known to me as LEWIS.

23

 

43.   On January 19, 2021, LEWIS provided RVRA Agents additional videos that he took on January 6, 2021, including videos that appear to depict portions of the inside of the United States Capitol building.   A screenshot from one of those videos is below.



44.  As described above, there is evidence that LEWIS had in his possession a digital device while at the U.S. Capitol on January 6, 2021.  In addition, based on photos and videos of the offenses that date, numerous persons committing the Target Offenses possessed digital devices that they used to record and post photos and videos of themselves and others committing those offenses.  Further, based on the investigation, numerous persons committing the Target Offenses possessed digital devices to communicate with other individuals to plan their attendance at the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

45.  Moreover, it is well-known that virtually all adults in the United States use mobile digital devices.  In a fact sheet from June 12, 2019, The Pew Research Center for Internet & Technology estimated that 96% of Americans owned at least one cellular phone, and that that same 2019 report estimated that 81% of Americans use at least one smartphone.  See Mobile Fact Sheet, https://www.pewresearch.org/internet/fact-sheet/mobile/ (last visited Jan. 9, 2021).

46.  In addition, in my training and experience, it is common for individuals to back up or preserve copies of digital

media (such as photos and videos) across multiple devices to
prevent loss.  Indeed, some companies provide services that
seamlessly sync data across devices, such as Apple devices and
the Apple iCloud service.  Thus, there is reason to believe that
evidence of the offense that originally resided on the LEWIS'
cell phone may also be saved to other digital devices on the
person of LEWIS.  Moreover, here, as widely reported in the news
media related to this matter, many individual committing the
Target Offenses kept and posted videos, photos, and commentary
about their participation in these offenses, essentially
bragging about their participation.  Based on that, there is
also probable cause to believe that evidence related to these
offenses may have been transferred to and stored on digital
devices beyond the particular digital device LEWIS possessed
during the offenses.

47.  Based on my training and experience, and on
conversations I have had with other law enforcement officers, I
know that some individuals who participate in activities aimed
at disrupting or interfering with governmental and/or law
enforcement operations have been known to use anonymizing
services and/or applications capable of encrypting
communications to protect their identity and communications.  By

26

using such tools, in some cases, the only way to see the content of these conversations is on the electronic device that had been used to send or receive the communications.

48.   Based on my training and experience, I also know that individuals typically store their digital devices, such as cell phones, tablets, and laptop computers, on or near their persons, where they can be easily accessed and used.

## V.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[4]

49.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have

---

[4]As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

      b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and

28

who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

    50.   Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of a person for a number of reasons, including
the following:

      a.   Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

51.  The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the

30

opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress LEWIS' thumb and/or fingers on the device(s); and (2) hold the device(s) in front of LEWIS' face with her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

## V. CONCLUSION

52.  For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Target Offenses will be found on the person of LEWIS, as described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
January, 2021.

_____

# EXHIBIT A

AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| United States of America<br>v.<br>Jacob Lewis<br><br>**Date of Birth:** 10/26/1983<br>*Defendant(s)* | Case: 1:21-mj-00155<br>Assigned to: Judge Zia M. Faruqui<br>Assign Date: 1/22/2021<br>Description: COMPLAINT W/ ARREST WARRANT |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ January 6, 2021 _____ in the county of _____ in the _____ in the District of _____ Columbia _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1752 (a)(1), (2)- Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority;<br>40 U.S.C. 5104(e)(2)(D) & (G)- Violent Entry and Disorderly Conduct on Capitol Grounds | |

This criminal complaint is based on these facts:

See attached statement of facts.

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Stephen R. Hart, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1
by telephone.

Date: _____ 01/22/2021 _____

2021.01.22
17:21:40 -05'00'
*Judge's signature*

City and state: _____ Washington, D.C. _____

ZIA M. FARUQUI, U.S. Magistrate Judge
*Printed name and title*

EXHIBIT A

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

District of Columbia

United States of America
v.

Jacob Lewis

_____
*Defendant*

) 
) Case: 1:21-mj-00155
) Assigned to: Judge Zia M. Faruqui
) Assign Date: 1/22/2021
) Description: COMPLAINT W/ ARREST WARRANT
) 

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*                                        Jacob Lewis                                        ,
who is accused of an offense or violation based on the following document filed with the court:

❏ Indictment      ❏ Superseding Indictment      ❏ Information      ❏ Superseding Information      ☒ Complaint
❏ Probation Violation Petition      ❏ Supervised Release Violation Petition      ❏ Violation Notice      ❏ Order of the Court

This offense is briefly described as follows:

18 U.S.C. 1752 (a)(1), (2)- Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority;
40 U.S.C. 5104(e)(2)(D) & (G)- Violent Entry and Disorderly Conduct on Capitol Grounds

2021.01.22
17:19:02 -05'00'

Date:      01/22/2021      

_____
*Issuing officer's signature*

City and state:      Washington, D.C.      

ZIA M. FARUQUI, U.S. Magistrate Judge
*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ . |
| Date: _____       _____<br>*Arresting officer's signature*<br><br>_____<br>*Printed name and title* |

## STATEMENT OF FACTS

On January 6, 2021, your affiant, Stephen R. Hart, was on duty and performing my official duties as a Special Agent for the Federal Bureau of Investigation. In addition to my regular duties, I am currently tasked with investigating criminal activity that occurred in and around the Capitol grounds on January 6, 2021. As a Special Agent, I am authorized by law or by a Government agency to engage in or supervise the prevention, detention, investigation, or prosecution of a violation of Federal criminal laws. The U.S. Capitol is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the U.S. Capitol was also closed to members of the public.

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

On January 8, 2021, the Federal Bureau of Investigation, Riverside California Residential Agency (RVRA) received a tip relayed from the National Threat Operations Center (NTOC) advising that Defendant Jacob Lewis (LEWIS) "flew from Victorville, CA to Washington, D.C. to attack the Capitol along with many Trump supporters to stop the certification of the electoral college." The tip stated LEWIS posted videos from the US Capitol on January 6, 2021 on his personal Instagram account: @jdl_333. The tip also stated that LEWIS was the owner of The Gym, a fitness business in Victorville, CA.

On January 11, 2021, RVRA received a telephone tip from another individual, who stated they were a friend of LEWIS. This person stated that during a conversation in December, 2020, LEWIS told them to "watch what happens to the Capitol on the 6th." This person said that LEWIS had shown them pictures of firearms and previously asked them if they could get LEWIS ammunition, but this person had never seen LEWIS with any guns in person and did not hear LEWIS make any threats of violence regarding January 6, 2021. This person observed photos or videos of the US Capitol from January 6, 2021 on Lewis' Instagram account, which they also identified as @jdl_333.

On January 15, 2021, LEWIS agreed to take part in an interview with RVRA Agents at his residence in Victorville, California regarding his involvement in the aforementioned events of January 6, 2021. LEWIS stated that he traveled from California to Washington D.C. from January 4-7, 2021 to attend President Trump's rally on January 6, 2021. He stated that he attended the rally on January 6, 2021 dressed in a black jacket, red beanie hat, and blue jeans.

LEWIS admitted that following the rally, he walked toward the Capitol, and that he then entered the capitol building with a number of people after it had been breached by others. He stated that he was never told that he could not enter, and that he was "escorted" by the Police in the building. He stated that he did not partake in any violence while he was in the building and that he believed that some individuals involved in agitating were Antifa members in disguise.

LEWIS acknowledged that his Instagram account is @jdl_333 and that he had posted videos of the capitol grounds on January 6, 2021. He provided RVRA with temporary access to view his account.

RVRA Agents and your affiant reviewed the video posted by LEWIS on Instagram on January 6, 2021. The video depicts a large crowd gathered on the steps and terrace of the US Capitol.

Your affiant also reviewed multiple other videos depicting the Capitol building and grounds on January 6, 2021. Among these videos, your affiant observed a video that had been posted online by another individual, and subsequently submitted to the FBI via an online tip. Based on the nature of the video, knowledge of LEWIS, a comparison to known photographs of LEWIS provided to your affiant, clothing consistent with the clothing that LEWIS acknowledged wearing on that day, and other evidence discussed herein, your affiant believes that this video depicts LEWIS walking up the US Capitol steps. A still from that video is included below:



Among these videos, your affiant also observed United States Capitol Police video from various locations in the Capitol Building. Based on the nature of the videos, knowledge of LEWIS, a comparison to known photographs of LEWIS provided to your affiant, clothing consistent with the clothing that LEWIS acknowledged wearing on that day, and other evidence discussed herein, your affiant believes that several of these videos depict LEWIS. Specifically, your affiant believes that LEWIS is depicted in a United States Capitol Police video breaching the Senate Wing Door to the Capitol Building at approximately 2:56:06pm on January 6, 2021. Additional US Capitol Police videos then show LEWIS walking by the House Wing doors, through the Hall of Columns, through the Crypt and then exiting out of the South Door at approximately 3:03pm. At no point does it appear that he has a police escort. A still from the video of LEWIS breaching the Senate Wing Door and a still from the video of LEWIS walking through the Hall of Columns wearing the same clothing is included below.

 

On January 19, 2021, LEWIS provided RVRA Agents additional videos that he took on January 6, 2021, including videos that appear to depict portions of the inside of the United States Capitol building. A screenshot from one of those videos is below.



Based on the foregoing, your affiant submits that there is probable cause to believe that Jacob Lewis violated 18 U.S.C. § 1752(a)(1) and (2), which makes it a crime to (1) knowingly enter or remain in any restricted building or grounds without lawful authority to do; and (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engage in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions; or attempts or conspires to do so. For purposes of Section 1752 of Title 18, a "restricted building" includes a posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service, including the Vice President, is or will be temporarily visiting; or any building or grounds so restricted in conjunction with an event designated as a special event of national significance.

Your affiant submits there is also probable cause to believe that Jacob Lewis violated 40 U.S.C. § 5104(e)(2)(D) and (G), which makes it a crime to willfully and knowingly (D) utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress; and (G) parade, demonstrate, or picket in any of the Capitol Buildings.

_____
SPECIAL AGENT STEPHEN R. HART
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 22nd day of January 2021.

2021.01.22
17:21:08 -05'00'

_____
ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

PERSON TO BE SEARCHED

The person of Jacob Daniel Lewis ("LEWIS"), date of birth October 26, 1983 with social security number 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 and FBI number 693943WC1.  LEWIS is approximately 6 feet tall with blond hair and blue eyes.  His last known address is 12606 Autumn Leaves Avenue, Victorville, California.

The search of LEWIS shall include any and all clothing and personal belongings, digital devices, backpacks, wallets, briefcases, purses, and bags that are within LEWIS' immediate vicinity and control at the location where the search warrant is executed.  The search shall not include a strip search or a body cavity search.

i

**ATTACHMENT B**

**I. PROPERTY TO BE SEIZED**

1.     The items to be seized are fruits, evidence,
information, contraband, or instrumentalities, in whatever form
and however stored, relating to violations of 18 U.S.C. §
1512(c)(2) (Obstruction of Congress); 18 U.S.C. § 111 (Assault
of a Federal Officer); 18 U.S.C. § 231 (Civil Disorders); 18
U.S.C. § 371 (Conspiracy); 18 U.S.C. § 372 (Conspiracy to Impede
or Injure Federal Officers); 18 U.S.C. § 930 (Possession of
Firearms and Dangerous Weapons in Federal Facilities); 18 U.S.C.
§ 641 (Theft of Government Property); 18 U.S.C. § 1361
(Destruction of Government Property); 18 U.S.C. § 2101
(Interstate Travel to Participate in a Riot); 18 U.S.C. §
1752(a)(1) and (2) (Unlawful Entry on Restricted Buildings or
Grounds); and Title 40 U.S.C. Section 5104(e)(2) (Violent Entry,
Disorderly Conduct, and other offenses on Capitol Grounds) (the
"Target Offenses") that have been committed by Lewis and other
identified and unidentified persons, as described in the search
warrant affidavit, including, but not limited to:

          a.     Records, documents, programs, applications, or
materials concerning planning to unlawfully enter the U.S.

i

Capitol, including any maps or diagrams of the building or its
internal offices;

  b. Records, documents, programs, applications, or
materials concerning unlawful entry into the U.S. Capitol,
including any property of the U.S. Capitol;

  c. Records, documents, programs, applications, or
materials concerning awareness of the official proceeding that
was to take place at Congress on January 6, 2021, i.e., the
certification process of the 2020 Presidential Election;

  d. Records, documents, programs, applications, or
materials concerning efforts to disrupt the official proceeding
that was to take place at Congress on January 6, 2021, i.e., the
certification process of the 2020 Presidential Election;

  e. Records, documents, programs, applications, or
materials relating to a conspiracy to illegally enter and/or
occupy the U.S. Capitol Building on or about January 6, 2021;

  f. Records, documents, programs, applications, or
materials concerning the breach and unlawful entry of the United
States Capitol on January 6, 2021;

  g. Records, documents, programs, applications, or
materials concerning the riot and/or civil disorder at the
United States Capitol on January 6, 2021;

  h. Records, documents, programs, applications, or
materials concerning the assaults of federal officers/agents and
efforts to impede such federal officers/agents in the

performance of their duties the United States Capitol on January 6, 2021;

       i.   Records, documents, programs, applications, or materials concerning damage to, or theft of, property at the United States Capitol on January 6, 2021;

       j.   Records, documents, programs, applications, or materials concerning efforts after the fact to conceal evidence of those offenses, or to flee prosecution for the same;

       k.   Records, documents, programs, applications, or materials concerning materials, devices, or tools that were used to unlawfully enter the U.S. Capitol by deceit or by force, including weapons and elements used to breach the building or to counter efforts by law-enforcement, such as pepper spray or smoke grenades;

       l.   Records, documents, programs, applications, or materials of communication devices, including closed circuit radios or walkie-talkies, that could have been used by co-conspirators to communicate during the unlawful entry into the U.S. Capitol;

       m.   Records, documents, programs, applications, or materials of the state of mind of LEWIS and/or other co-conspirators, e.g., intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation; and

n.    Records, documents, programs, applications, or materials concerning the identity of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the unlawful actors about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts.

o.    Any records and/or evidence revealing LEWIS' presence at the January 6, 2021, riot;

p.    Any physical records, such as receipts for travel, which may serve to prove evidence of travel of to or from Washington D.C. from December of 2020 through January of 2021;

q.    LEWIS' (and other persons') motive and intent for traveling to the U.S. Capitol on or about January 6, 2021;

r.    LEWIS' (and other persons') activities in and around Washington, D.C., specifically the U.S. Capitol, on or about January 6, 2021

s.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Target Offenses, and forensic copies thereof.

t.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   evidence of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to violations of the Target Offenses;

vii. evidence of LEWIS' use or connection to social media accounts;

viii.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

v

ix.  applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

x.  records of or information about Internet Protocol addresses used by the device;

xi.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters,

monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICES

4.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

vii

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device

viii

does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

ix

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.

x

Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

7.    During the execution of this search warrant, law enforcement is permitted to: (1) depress LEWIS' thumb- and/or fingers onto the fingerprint sensor of the digital device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of LEWIS' face with her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.